**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **BRAD C. WALKER, et al.,** | Civ. No. 19-16853 (KM) (ESK) |
| **Plaintiffs,** | |
| **v.** | **OPINION** |
| **CITY OF NEWARK, et al.,** | |
| **Defendants.** | |

**KEVIN MCNULTY, U.S.D.J.:**

This action arises out of an altercation between plaintiff Brad Walker, whose family owns and manages a bar in Newark, and defendant Newark police officers Zaynah Pickett, Dwayne Mays, Jr., and Maurice McKelvin, who patronized the bar on the evening of June 2, 2018. Alleging that he suffered physical and psychological injuries as a result of that altercation, Walker brought constitutional and tort claims against Pickett, Mays, and McKelvin (the "officer defendants") and against the City of Newark ("the City").[1] The officer defendants now move for summary judgment on all claims asserted against them, while the City separately moves for summary judgment on the two remaining claims asserted against it. For the reasons set forth below, the City's motion for summary judgment (DE 94) is **GRANTED** and the officer defendants' motion for summary judgment (DE 100) is **GRANTED** in part and **DENIED** in part.[2]

---

[1]     Walker also sued Officer Czezre Adams of the Newark Police Department, but Adams has not moved for summary judgment. There is no evidence in the record to suggest that Officer Adams was involved in the altercation.

[2]     Certain citations to the record will be abbreviated as follows:

## I.      Background

On the night of June 2, 2018, defendant Zaynah Pickett hosted a birthday party for herself at the Allure Lounge in Newark. (Off. SOMF ¶2; Resp. to Off. SOMF ¶2.) Defendants Dwayne Mays, Jr. and Maurice McKelvin attended the party. (Off. SOMF ¶1.)

The Allure Lounge is a bar owned by Walker's parents. (Off. SOMF ¶5.; Walker Dep. 21:16-25.) Walker's father, who manages the bar, had agreed to rent out the private second-floor space to Pickett for the evening. (Off. SOMF ¶5.) Because Walker's father was out of town on the night of Pickett's party,

---

DE = Docket entry number

Compl. = First amended complaint (DE 47)

Newark MSJ = Memorandum of law in support of City's motion for summary judgment (DE 94-3)

Newark SOMF = Statement of undisputed material facts in support of City's motion for summary judgment (DE 94-2)

Resp. to Newark SOMF = Plaintiffs' response to City's statement of material facts (DE 102)

Pl. SOMF = Plaintiffs' statement of material facts in dispute (DE 103)

Opp. to Newark MSJ = Plaintiff's memorandum of law in opposition to the City's summary judgment motion (DE 103-1)

Newark Repl. = Reply memorandum of law in support of the City's motion for summary judgment (DE 105)

Off. MSJ = Memorandum of law in support of officer defendants' motion for summary judgment (DE 100-4)

Off. SOMF = Statement of undisputed material facts in support of officer defendants' motion for summary judgment (DE 100-1)

Resp. to Off. SOMF = Plaintiffs' response to officer defendants' statement of material facts (DE 104)

Walker Dep. = Deposition of Brad Walker on July 21, 2022 (DE 94-5)

Walker was acting as bar manager in his place. (Newark SOMF ¶2; Walker Dep. 130:11-131:8.) Walker had never interacted with any of the officer defendants prior to the night of the party. (Off. SOMF ¶6.)

Guests at Pickett's birthday party were required to dress entirely in white, while Pickett wore a gold-colored dress. (Off. SOMF ¶7; Newark SOMF ¶3.; Walker Dep. 58:18-20.) It is implied that no one associated with the party was in uniform. At some point during the evening, Pickett noticed that there were individuals present in the second-floor space who were not wearing white, and she complained to Walker. (Off. SOMF ¶7; Newark SOMF ¶3.) These individuals were business associates of Walker's who were meeting him at the Lounge. (Walker Dep. 35:11-18.)

According to Pickett, Walker and his associates had also been touching her guests inappropriately. (Off. SOMF ¶8.) When she requested that they leave the second-floor space, Walker responded aggressively and said something to the effect of "it's my club and I can do what I want." (*Id.* ¶¶9-10.) The security guard had to intervene in their conversation and was able to get Walker's associates to leave the second floor. (*Id.*)

Walker's account of the evening, beginning with this particular interaction, differs significantly. Walker maintains that he never touched any of Pickett's guests inappropriately; nor did he state that he could do whatever he wanted because it was his club. (Resp. to Off. SOMF ¶¶8-9.) According to Walker, it was Pickett who became aggressive with him during their conversation, and it was Walker, not a security guard, who asked his associates to go downstairs at the request of Pickett. (Resp. to Off. SOMF ¶10.) Indeed, Walker maintains that there was no security guard present that night. (*Id.* ¶¶11-12.)

Following their encounter, Pickett went outside of the Lounge to the street, while Walker remained inside on the second floor. (Off. SOMF ¶¶12-13.) Walker subsequently witnessed one of Pickett's guests bring out a birthday cake, which had four bottles of tequila stuck on top of it. (Off. SOMF ¶13; Resp.

3

to Off. SOMF ¶13.) The tequila was not purchased at the Lounge. (Off. SOMF ¶13; Resp. to Off. SOMF ¶13.)

According to Walker, he explained to a group of guests that outside alcohol is not permitted on the premises, which led to a verbal disagreement between the guests and Walker. (Walker Dep. 41:12-42:9.) The disagreement turned physical when one of the male guests pushed Walker, who proceeded to exit the Lounge with the cake. (Newark SOMF ¶5; Off. SOMF ¶14.) Pickett claims that Walker, before exiting the Lounge, threw cake in her friend's face because the friend had rebuffed Walker's continued advances. (Off. SOMF ¶14.)

Walker maintains that once he was outside of the Lounge, an attendee at Pickett's party confronted him and began verbally threatening him. (Walker Dep. 47:5-48:11.) Walker contends that his two business associates were next to him outside, and "they end[ed] up getting into it" with another attendee. (*Id.* 49:14-20.) After arguing for a bit, the guest "took a swing" at one of the associates and hit the other. (*Id.* 51:2-9.) Pickett says that she then announced that the party was over, while Walker denies that she made any such pronouncement. (Off. SOMF ¶15.)

At that point, Walker went back inside the Lounge and up to the second-floor office, where he recovered a firearm. (Off. SOMF ¶16; Newark SOMF ¶6.) The firearm was registered to Walker's mother and was stored on the premises by the family. (Off. SOMF ¶17.) Walker admits that he did not call the police or ask any of Pickett's guests to leave the premises. (*Id.* ¶18.)

What occurred when Walker returned to the street is disputed. According to Pickett, once Walker was back outside, he followed her to an adjacent parking lot as she walked toward her car. (Off. SOMF ¶19.) At that time, the firearm was still concealed in his waistband. (*Id.* ¶20.) He then began yelling at Pickett in an aggressive and threatening manner and "got in her face." (*Id.* ¶21.) According to Pickett, Walker's eyes were "glassy, red, and beady," and "he was foaming at the mouth." (*Id.*) Afraid, Pickett punched Walker once with a

closed fist in order to protect herself. (*Id.* ¶22.) Walker immediately took out his weapon and fired a shot. (*Id.* ¶23.)

Walker's version of events is that he armed himself in order to protect his associates, who had remained outside while he went to retrieve the gun. (Walker Dep. 52:5-10; Resp. to Off. SOMF ¶19.) He contends that he went back outside in order to locate his associates, but he was immediately confronted by Pickett, who pursued him and began physically attacking him. (Resp. to Off. SOMF ¶19, 22; Walker Dep. ¶59:12-17; Newark SOMF ¶7.) While attempting to protect himself from Pickett, Walker noticed four or five men dressed in white approaching him. (Walker Dep. 63:3-13.) Feeling threatened, Walker pulled out the gun, fired a single shot into the air, then pointed the gun at the ground. (Newark SOMF ¶7; Resp. to Newark SOMF ¶7; Off. SOMF ¶24; Walker Dep. 68:3-6.) It is not clear whether the officer defendants dispute that Walker fired straight into the air; the City, however, does not dispute this. (Newark SOMF ¶7.)

The parties agree that after Walker fired the gun, an individual dressed in white yelled "Newark police" and then fired his own weapon directly at Walker (who was not hit). (Off. SOMF ¶25; Newark SOMF ¶8.) Walker immediately got down on the ground and tossed his firearm away from his body. (Off. SOMF ¶26.) Walker claims that, until this moment, he had been unaware that any of the guests at the birthday party were police officers.

It is also undisputed that the individual who had shot at Walker proceeded to kneel on his back and place him in handcuffs. (Off. SOMF ¶26; Newark SOMF ¶9.) According to Walker, the individual then said, "You're going to shoot at cops?", to which Walker replied, "I didn't know you all was cops." (Walker Dep. 74:4-9.) The individual then told him to "shut up" and hit him in the face with a gun. (*Id.*; Off. SOMF ¶26; Newark SOMF ¶10.)

While Walker was still on the ground, he was punched, kicked, and dragged by at least two individuals, one of whom was the person who had handcuffed him. (Off. SOMF ¶26; Walker Dep. 2-9.) At that point, says Walker, an employee at the Allure Lounge named Michael Bullock walked over to where

the officers were beating him. (Walker Dep. 77:14-16.) According to Walker, Bullock said, "What are you all doing? That's the owner of the bar," at which point the individuals backed away from Walker. (*Id.* 79:8-12.) The individual who had handcuffed Walker then pulled out his phone and called the police. (*Id.* 79:17-22.)

According to Walker, the individual who shot at him, handcuffed him, and then struck him in the face was defendant Mays. Defendant McKelvin, he says, was one of the individuals, including Mays, who punched and kicked him. (Resp. to Off. SOMF ¶25; Walker Dep. 78:1-23; 149:3-19.)

Both Mays and McKelvin deny playing any part in these events:

Mays says he was outside of the Lounge when he saw Walker exit the building and head towards the parking lot. (Off. SOMF ¶28.) Mays saw Walker following Pickett and began to walk towards the parking lot himself. (*Id.* ¶¶29-30.) Mays then heard a gunshot and saw a muzzle flash, and later saw Walker on the ground. (*Id.* ¶¶30, 34.) Mays maintains that he drew his service weapon but did not use it at any point that night, and that he did not speak to Walker at all. (*Id.* ¶¶31, 34.)

Defendant McKelvin's denial is complete. He states that although he attended Pickett's party, he did not interact with Walker at any point, was not in the vicinity of the parking lot when gunshots were fired, and did not learn about the incident until the following day. (Off. SOMF ¶¶38-40.)

According to Walker, all of the officer defendants left the area before uniformed Newark police officers arrived. (Resp. to Off. SOMF ¶¶35-36.) Mays, however, contends that he remained at the scene until uniformed officers arrived. Pickett maintains that she was carried to a car by her sister and her sister's friend, as she was in shock after Walker fired his weapon. (Off. SOMF ¶¶35-36.) Walker was detained following the arrival of uniformed officers, who conducted an investigation. (Newark SOMF ¶11.) Walker claims that he was forced to remain in a Newark police vehicle, still handcuffed, for some ten hours. (Resp. to Newark SOMF ¶11; Pl. SOMF ¶2.) He also testified that he was

6

held in a cell at the Essex County Correctional Facility for several days before he was released. (Walker Dep. 96:1-13.)

## II.    Procedural history

Walker and his spouse filed a civil complaint in the Superior Court of New Jersey, Essex County, on July 17, 2019. (DE 1-1.) On August 6, 2019, defendant Essex County removed the case to federal court. (DE 1.) Essex County was dismissed from the action on November 27, 2019. (DE 27.)

On July 1, 2020, I granted in part and denied in part the motion to dismiss of the City and the officer defendants. (DE 39, 40.) Plaintiffs thereafter filed an amended complaint (DE 48), which the City again moved to dismiss (DE 54). I granted in part and denied in part the City's motion to dismiss on April 29, 2021. (DE 66, 67.)

Discovery concluded on August 30, 2022. (DE 87.) On October 21, 2022, the City filed its motion for summary judgment (DE 94). The officer defendants filed their separate summary judgment motion on November 4, 2022 (DE 100.)

## III.    Legal standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)).

The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an

absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist).

Unsupported allegations, subjective beliefs, or argument alone cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 330 (3d Cir. 1995) ("[T]he nonmoving party creates a genuine issue of material fact if it provides sufficient evidence to allow a reasonable jury to find for him at trial."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55, n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

## IV.   Discussion

### A. Officer defendants

I begin with the claims against the officer defendants. The surviving claims against these defendants are excessive force under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act ("NJCRA") (Counts 1 and 5), negligent and intentional infliction of emotional distress (Counts 2 and 3), assault (Count 4),

and *per quod* (Count 7). I will first address the constitutional claims (IV.A.i) and then turn to the tort claims (IV.A.ii).

### i. Constitutional claims

Count 1 asserts a claim for excessive force under 42 U.S.C. § 1983. That section "provides a cause of action against state and local officers for 'the deprivation of any rights ... secured by the Constitution and laws.'" *McCray v. Jones*, No. 21-3294, 2022 WL 17485957, at \*2 (3d Cir. Dec. 7, 2022). To succeed on a § 1983 claim, a plaintiff must demonstrate that: (1) a person deprived her of a federal right; and (2) the person who deprived her of that right acted under color of state law. *Groman v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)).

Under element (2), "a state employee who pursues purely private motives and whose interaction with the victim is unconnected with his execution of official duties does not act under color of law." *Ecotone Farm LLC v. Ward*, 639 F. App'x 118, 126 (3d Cir. 2016) (internal citations and quotations omitted). Nevertheless, "off-duty police officers who flash a badge or otherwise purport to exercise official authority generally act under color of law . . . informal, behind the scenes exertion of state authority is as much within the scope of § 1983 as the more usual examples of formal and open action leading to the denial of federal rights." *Id.* (Internal citations and quotations omitted.)

Based on the present record, no reasonable jury could conclude that the officer defendants were on duty on the evening of June 2, 2018. The record demonstrates that they were attending (in Pickett's case, hosting) a social gathering. They were dressed in white (in Pickett's case, gold), and thus were not in uniform. There is no evidence that the officers were part of an undercover or plainclothes unit.

On the other hand, at least one of them did start acting in an official capacity at some point. It is undisputed that someone yelled "Newark police" after Walker fired his gun; that Walker responded by immediately getting to the ground and tossing his firearm away from him; and that an officer/guest then

restrained and handcuffed him. (Off. SOMF ¶¶25-26; Newark SOMF ¶¶8-9.) These undisputed facts demonstrate that the individual involved was purporting to exercise official authority, and that Walker was submitting to what he reasonably perceived to be the power of the state. In addition, the officer defendants do not dispute that the individual who handcuffed Walker shot directly at him before doing so and, after handcuffing him, proceeded to strike him in the head with a gun.[3] (Off. SOMF ¶¶25-26.) Nor do they dispute that a group of "cops" then punched, kicked, and dragged Walker. (*Id.* at ¶26.) A reasonable jury could conclude that these actions were also taken under color of state law, as the actors were "exerting influence . . . they possessed by virtue of the power and authority vested in them" by the state. *Kletschka v. Driver*, 411 F.2d 436, 447 (2d Cir. 1969)

The only dispute with respect to these facts is over the identity of the particular officers who were involved in this use of force. Walker testified at his deposition that Mays was the person who shot at him, handcuffed him, and struck him, and that McKelvin, along with Mays (and perhaps other individuals), punched, kicked, and dragged him. (Walker Dep. 68:7-69:10; 78:1-23; 149:3-19.) The officer defendants rely on their interrogatory answers, in which they assert that Mays witnessed the gunfire and the assault on Walker but did not participate, and that McKelvin had left the premises by the time all of this occurred. (Off. SOMF ¶¶31, 34; 38-40.)

The officer defendants argue that Walker cannot meet his burden of proof in identifying Mays and McKelvin by relying solely on his self-serving deposition testimony. (Off. MSJ 2.) Walker's testimony, however, "is not a conclusory, self-prepared affidavit, but rather testimony elicited from questions by opposing counsel which challenged [Walker's] recollection of events." *Johnson v. MetLife Bank, N.A.*, 883 F. Supp. 2d 542, 550 (E.D. Pa. 2012). Under the summary

---

[3]     It is not stated whether this was a service weapon. According to Walker, the individual then said, "you're going to shoot at cops?", to which Walker replied, "I didn't know you all was cops." (Walker Dep. 74:4-9.) That exchange immediately preceded the beating.

judgment standard, which is designed to identify, not resolve, issues of fact, such testimony could be set aside only under extreme circumstances not present here. *Cf. Irving v. Chester Water Auth.*, 439 F. App'x 125, 127 (3d Cir. 2011) (deposition testimony was insufficient to raise a genuine issue of fact where it conflicted with same witness's earlier testimony and other record evidence).

The defendants argue that Walker merely "guesses, assumes, and offers nothing but conjecture" as to their identities. (Off. MSJ 2.) Walker, however, is offering more than a guess; he identifies these officers as the people he actually saw. Now it is true that Walker had never met these defendants prior to the evening of June 2, 2018, but that fact alone does not render him incapable of identifying them. These circumstances may be fodder for cross-examination, but it is up to the jurors to assess the reliability of Walker's testimony in the context of all the evidence, and to give it such weight as they deem appropriate.

I conclude that a reasonable jury could credit Walker's account and find that Mays and McKelvin, acting under color of state law, used force against Walker. I therefore turn to whether Mays and McKelvin deprived Walker of a federal right by using force against Walker that was excessive.

An excessive force claim is analyzed under the Fourth Amendment's reasonableness standard. *See Graham v. Connor*, 490 U.S. 386, 388 (1989). The relevant inquiry is "whether the officer's actions are 'objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (citations omitted).

The Third Circuit has enumerated some important considerations:

In deciding whether challenged conduct constitutes excessive force, a court must determine the objective 'reasonableness' of the challenge conduct, considering "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Carswell* [*v. Borough*, 381 F.3d 235], 240 (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865).

> Other factors include "the duration of the [officer's] action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997). In evaluating reasonableness, the court must take into consideration the fact that "police officers are often faced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force necessary in a particular situation." *Graham*, 490 U.S. at 397, 109 S.Ct. 1865. Thus, the court should not apply "the 20/20 vision of hindsight," but should instead consider the "perspective of a reasonable officer on the scene." *Id.* at 396, 109 S.Ct. 1865.

*Couden v. Duffy*, 446 F.3d 483, 496-97 (3d Cir. 2006).

In view of these considerations, and on Walker's version of the facts, a reasonable jury could find that Mays applied excessive force when he pistol-whipped Walker, who was already on the ground and handcuffed. It could also find that Mays and McKelvin applied excessive force when they punched, kicked, and dragged Walker, who was on the ground and not resisting. Walker had already submitted to authority, put down his weapon, and was handcuffed. Thus, a reasonable jury could conclude that there was no ongoing threat to officer safety that might have justified the use of such force. *See Lamont v. New Jersey,* 637 F.3d 177, 184 (3d Cir. 2011) ("Even where an officer is initially justified in using force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished.").

Whether a reasonable jury could find that Mays used excessive force when he shot directly at Walker, who had just fired his own weapon—albeit straight into the air—is a closer question. The officer defendants do not argue this issue; instead they rely solely on Mays's assertion that he never fired his weapon at all. The facts being in conflict and the context confused, I must leave to the jury the issue of whether Mays's firing a weapon at an armed individual, under all the circumstances, and assuming it occurred, constituted excessive force. Accordingly, I will deny summary judgment on the § 1983 excessive force claim as asserted against defendants Mays and McKelvin.

I will, however, grant summary judgment on the § 1983 excessive force claim as asserted against defendant Pickett. There is evidence that Pickett punched Walker at least once in the parking lot outside of the Lounge, and perhaps more. Walker acknowledged, however, that Pickett did not identify herself as a police officer during this altercation, and Walker's testimony makes clear that he did not know that any of the individuals at Pickett's party were law enforcement until somewhat later, when he fired his gun and someone yelled "Newark police." (Walker Dep. 61:25-62:2; 74:5-9.) Pickett, when she struck Walker, was not purporting to exercise state authority, nor did Walker perceive her to be doing so. No reasonable jury could find that her actions were taken under color state law.

Turning to the parallel NJCRA excessive force claim, I will similarly deny summary judgment as to defendants Mays and McKelvin and grant summary judgment as to defendant Pickett. The NJCRA provides, in pertinent part, a private cause of action to

> [a]ny person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law.

N.J.S.A. § 10:6–2(c). The New Jersey State Legislature, when it enacted the NJCRA, intended it to parallel 42 U.S.C. § 1983, and sought to incorporate existing § 1983 jurisprudence. *Perez v. Zagami, LLC*, 218 N.J. 202, 215; *see also Ramos v. Flowers*, 429 N.J. Super. 13, 23 (App. Div. 2012) (stating that NJCRA was "modeled on the federal civil rights law which provides for a civil action for deprivation of civil rights." (citations omitted)). Thus, the NJCRA is construed nearly identically to § 1983. As the parties have not suggested any distinction between the excessive force claims under § 1983 and the NJCRA, I conclude that a reasonable jury could find that Mays and McKelvin, but not

Pickett, used excessive force against Walker under color of state law within the meaning of the NJCRA.

ii.   **Tort claims**

I will address the four tort claims together, as they involve a similar set of facts.

Under New Jersey Law, a claim for negligent infliction of emotional distress (NIED) is "understood as negligent conduct that is the proximate cause of emotional distress in a person to whom the actor owes a legal duty to exercise reasonable care." *Decker v. Princeton Packet, Inc.*, 561 A.2d 1122, 1128 (N.J. 1989). With an intentional infliction of emotional distress (IIED) claim, "the plaintiff must prove that the defendant acted intentionally or recklessly." *Buckley v. Trenton Saving Fund Soc.*, 544 A.2d 857, 863 (N.J. 1988). In either case, "the emotional distress suffered by plaintiff must be so severe that no reasonable [person] could be expected to endure it." *Ingraham v. Ortho-McNeil Pharm.*, 422 N.J. Super. 12, 20 (N.J. Super Ct. App. Div. 2011); *Buckley*, *supra*, at 857.

To succeed on a common law claim of assault, a plaintiff must prove that the defendant intended "to cause a harmful or offensive contact" or "an imminent apprehension of such a contact." *Wigginton v. Servidio*, 324 N.J. Super. 114, 129 (App. Div. 1999) (quoting *Restatement (Second) of Torts* § 21 (1965)). The plaintiff must also show that she was "thereby put in such imminent apprehension." *Id.*

Finally, a *per quod* claim is "a claim for compensation for the loss of a spouse's companionship and services due to defendant's harmful actions." *Alberts v. Gaeckler*, 446 N.J. Super. 551, 565 (Law. Div. 2014). This claim, as asserted by Walker's spouse, Makeitha, is dependent on Walker's prevailing on his claims for personal injury. *Id.* at 566.

Walker testified that he experienced harmful contact from each of the officer defendants, as well as emotional trauma in the ensuing years. (Walker Dep. 100:17-23.) He testified that he has received psychiatric treatment and

14

was prescribed medication to deal with his symptoms, which include difficulty sleeping, anger, and excessive drinking. (*Id.* 101:11-25; 102:3-11; 107:17-23; 108:17-22.) In addition, Walker testified that the events of June 2, 2018, have had a significant, negative impact on his relationship with his wife. (*Id.* 186:15-188:14.)

For the moment, I consider only the tort liability of Mays and McKelvin. These defendants do not challenge the sufficiency of the evidence in the record to support claims for NIED, IIED, assault, or *per quod* as against the actual persons who punched, kicked, and struck Walker. Rather, they deny that they were the persons responsible; there is insufficient evidence, they say, that they were the ones who struck Walker. I have already addressed this argument and have rejected it. I will therefore deny summary judgment on the tort claims as asserted against defendants Mays and McKelvin.[4]

In regard to the tort liability of Pickett, the officer defendants argue that Pickett only punched Walker once with a closed fist, and that she did so in self-defense. (Off. SOMF 9.) That, of course, is Pickett's version of events, which the jury may or may not decide to credit. Walker's version is that Pickett was the initial aggressor and that she repeatedly punched and kicked him while he attempted to move away from her and "hold[] her back with [his] left hand." (Walker Dep. 60:17-61:20.)

---

[4] I note that the New Jersey Tort Claims Act contains a "verbal threshold requirement" in relation to damages for pain and suffering. *See DelaCruz v. Borough of Hillsdale*, 183 N.J. 149, 162 (N.J. 2005). This section provides that "no damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury" except "in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00." *See* N.J. Stat. Ann. § 59:2-2(b). Walker testified that his injuries resulted in a scar on his face that remained as of the date of his deposition – over four years later. (Walker Dep. 95:12-16; 188:15-24.) Although it is not clear from the record whether his medical treatment expenses were in excess of $3,600, the officer defendants did not put this statutory requirement at issue in their summary judgment motion. Should the matter proceed to trial, Walker will need to produce evidence of his medical treatment expenses in order to show that this case is one in which damages may be allowed. He will also need to show causation, as it is not apparent from the record whose actions resulted in the scar on his face.

On either side's version, a reasonable jury could find that Pickett is liable for assault. The claims against Pickett for NIED, IIED, and *per quod*, however, are much more tenuous. There is little evidence from which a jury could conclude that Pickett acted in concert with Mays and McKelvin in regard to the subsequent beating. Pickett's actions alone were not so outrageous as to have caused Walker severe emotional distress and thereby negatively impact his marital relationship. I will therefore deny summary judgment on the assault claim as asserted against defendant Pickett and grant summary judgment on the other three tort claims asserted against her.

**B. The City**

The only remaining claims against the City are claims of excessive force under the NJCRA (Count 1) and § 1983 (Count 6). "The legal principles governing the liability of a municipality under the [NJ]CRA and § 1983 are essentially the same." *Winberry Realty P'ship v. Borough of Rutherford*, 253 A.3d 636, 650 (N.J. 2021). Under both statutes, "a municipality can be held liable only if it causes harm through 'the implementation of official municipal policy.'" *Id.* (Citing *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1951 (2018)). That policy can be a widespread custom or practice, or it can be a failure or inadequacy of the municipality that "reflects a deliberate or conscious choice." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019). In all cases, "there must be a direct causal link between the municipality's custom, policy, or practice and the alleged constitutional deprivation." *Est. of Yearby v. Middlesex Cnty*, No. A-1974-20, 2022 WL 1714534, at *15 (N.J. Super. Ct. App. Div. May 27, 2022), *cert. denied*, 284 A.3d 444 (N.J. 2022). *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).

As discussed above, a rational trier of fact could find that Mays and McKelvin—both of whom are officers employed by the Newark Police Department—used excessive force against Walker. *See* Part A.i, *supra*. The critical question with respect to the City's liability is whether there is a direct

causal link between the officers' use of excessive force and official municipal policy.

According to Walker, his injuries are directly linked to the City's failure to train and supervise its officers to prevent the use of excessive force, as well as its practice of ignoring and condoning by silence the use of excessive force. (Compl. 15.) I will address these arguments in turn.

The Supreme Court has emphasized that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on failure to train." *Connick c. Thompson*, 563 U.S. 51, 61 (2011). "To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with who the [untrained employees] come into contact.'" *Id.* (Quoting *Canton*, 489 U.S. at 388). Deliberate indifference may be demonstrated by "[a] pattern of similar constitutional violations by untrained employees." *Connick*, *supra*, at 62. As the Court has explained:

> If a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'— necessary to trigger municipal liability.

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 407–08 (1997).

To support his failure to train claim, Walker relies on two reports, the first of which contains findings from a 2014 investigation of the Newark Police Department ("NPD") by the U.S. Department of Justice and the U.S. Attorney's Office for the District of New Jersey (the "2014 Report"). (Ex. B to DE 103.) The 2014 Report identified "a pattern or practice of constitutional violations" in the NPD, including in "the Department's use of force." (2014 Report 1.) As noted in the Report, the investigation revealed that "NPD officers escalate common policing situations, in which force should be unnecessary or relatively minimal,

to situations in which they use significant force, sometimes unreasonably." (*Id.* at 24.) In many cases, the use of force was "not necessary for the officer to control the situation and seemed to be simply retaliatory." (*Id.*)

The 2014 Report further found that deficient training practices contributed to the pattern of constitutional violations. (2014 Report 44.) According to the Report, "[t]he NPD's officer training records did not document any regular annual training on routine police practices and current legal developments, such as those related to use of force." (*Id.*) Although such matters were evidently covered by a refresher training presented annually by the prosecutor's office, the Report noted that officer attendance at that annual training was limited. (*Id.* at 45.)

In response to the findings of the 2014 investigation, the DOJ and the City entered into a consent decree that sets forth specific tasks designed to correct the NPD's past unconstitutional practices. The second report Walker relies on, published in 2018, contains findings of an Independent Monitoring Team established to evaluate the NPD's progress (the "2018 Report"). (Ex. C to DE 103.) The reporting period for the 2018 Report is January 1, 2018 – March 31, 2018, just a few months prior to the incident at issue in this action. With respect to training on use of force, the 2018 Report noted that "NPD is seeking external funds to retain an expert to develop its use of force training plans and curriculum. Although well-intentioned, due to factors outside of NPD's control, this process turned into a nearly two-year delay to the development of this training." (*Id.* at 22.)

The 2014 and 2018 Reports provide a foundation for a failure to train claim. The 2014 Report demonstrates that the City was put on notice of a pattern of excessive use of force and the need for better use-of-force training. If the follow-up had been timely and effective, this would have been evidence that the City had addressed the problem, and would weigh against *Monell*-style liability. The 2018 Report, however, essentially states that the City, despite good intentions, still had much work to do to implement effective training.

18

Walker submitted both reports at the motion to dismiss stage. At that time, I concluded that, construing the contents of the reports as true, Walker had stated a claim for *Monell* liability on a failure-to-train theory. I noted, however, that the claim "require[d] development in discovery." (DE 40 at 20.) Discovery has now closed, and it appears that Walker did not conduct any discovery on this issue. He did not depose defendants Mays and McKelvin or otherwise obtain information on the use-of-force training that they had received prior to the date of this incident. Nor did he depose any other employee of the NPD or otherwise obtain information on the contents of the use-of-force trainings provided prior to this incident. Such evidence is necessary to demonstrate a "direct causal link" between the City's failures, whatever they may be, and the actions of two of its officers. *Canton*, 489 U.S. at 385. It is possible, for example, that Mays and McKelvin had received sufficient training on the appropriate use-of-force, whether in the police academy or by attending the annual trainings provided by the prosecutor's office. If they had, then the City's shortcomings could not be deemed the "moving force" behind this particular constitutional deprivation. *Id.* at 389.

I reach the same conclusion with respect to Walker's theory that the City's liability is premised on its practice of ignoring and condoning the use of excessive force. The 2014 Report identified "deficiencies in the NPD's systems that are designed to prevent and detect misconduct, including its systems for reviewing force and investigating complaints regarding officer conduct." (2014 Report 1.) According to the 2018 Report, NPD was in the process of revising its policies for complaint intake and disciplinary processes, after which it would be required to train its internal affairs staff on how to effectively implement these updated policies. (2018 Report 26.) This suggests that the issues with complaint intake and disciplinary procedures were not remedied by 2018. Still, Walker has failed to develop in discovery or to produce any information that would allow the jury to conclude that those unresolved issues "actually caused" his constitutional injury. *See Canton*, 489 U.S. at 391. For instance, Walker did not obtain information on whether, prior to this incident, any complaints had

19

been lodged against Mays or McKelvin specifically, and what the results of those complaints were. *See Williams v. Ponik*, 822 Fed. Appx. 108, 113 (3d Cir. 2020) (City was not liable for acquiescing in a custom of tolerating use of excessive force where defendant officer had no prior complaints of excessive force against him).

Walker appears to rely on the fact that he was never interviewed as part of NPD's internal affairs' investigation into the incident. (Pl. SOMF ¶3.) He testified, however, that he spoke with either the prosecutor's office or internal affairs unit after the incident, and that he received a letter from the City stating that the officers involved had been dealt with appropriately. (Walker Dep. 115:25-116:3; 177:14-21.) Walker also testified that he learned from a newspaper article that the officers had been suspended. (*Id.* 116:4-8.) Walker presented no evidence indicating that suspension is not an appropriate disciplinary response to an excessive use-of-force incident like this one.

In light of Walker's failure to develop or present evidence to support his claims of municipal liability, I will grant the City's motion for summary judgment.[5] Counts 1 and 6 are dismissed as against the City.

---

[5] In this footnote, I address a few miscellaneous issues that do not, in my estimation, affect the analysis.

In his statement of material facts in dispute, Walker states that, sometime after the June 2018 incident, he was pulled over by an NPD officer who told him that he should not have sued the City. (Pl. SOMF ¶7.) While perhaps ominous, the officer's statement does not support Walker's claim of municipal liability for excessive use of force.

The same goes for Walker's assertion that defendant Pickett "has been dispatched to the locale of Plaintiff's business in her official capacity as a Newark Police Officer." (*Id.* ¶6.) By this, he appears to mean that, after the incident, he has seen Pickett going about her official duties in the general vicinity of the Allure Lounge. (Walker Dep. 180:9–23) The significance, if any, is obscure. At any rate, as discussed in Part A.i, *supra*, the evidence is that Pickett, while she may have struck Walker at some point, did not act under color of state law so as to give rise to a constitutional claim against her that could be the predicate for municipal liability.

That Mays and McKelvin may have used department-issued handcuffs and firearms in executing the arrest of Walker may contribute to a finding that they acted under color of state law. (Opp. to Newark MSJ 3.) It does not entail a finding that the City itself has *Monell* liability for their acts.

20

## V.    Conclusion

For the reasons set forth above, the City's motion for summary judgment (DE 94) is **GRANTED** and the officer defendants' motion for summary judgment (DE 100) is **GRANTED** in part and **DENIED** in part. Specifically, the constitutional claims asserted against defendant Pickett in Counts 1 and 5 are dismissed, as are the tort claims asserted in Counts 2, 3, and 7. The following claims remain:

**Count 1** (NJCRA excessive force) asserted against Mays and McKelvin

**Count 2** (NIED) asserted against Mays and McKelvin

**Count 3** (IIED) asserted against Mays and McKelvin

**Count 4** (assault) asserted against Pickett, Mays, and McKelvin

**Count 5** (§ 1983 excessive force) asserted against Mays and McKelvin

**Count 7** (*per quod*) asserted against Mays and McKelvin

An appropriate order will issue.

Dated: May 16, 2023

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**

---

I reject the City's argument that Walker was required to present expert testimony to demonstrate why and how Walker's injuries or arrest deviated from acceptable police protocols or were otherwise unlawful. (Newark Repl. 5.) A lay jury, properly instructed in the law, can conclude without the aid of expert testimony that continuing to beat an individual after that person has been handcuffed and no longer poses a threat is unlawful and contrary to any proper use-of-force policy.